Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7871 | **DATE** | 7/25/2002 |
| **CASE TITLE** | Richard A. Buff vs. Tempel Steel Co. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Temple Steel's motion for summary judgment is granted and this action is dismissed with prejudice. (13-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JUL 25 2002 date docketed | |
| ✓ | Docketing to mail notices. | | 24 |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| | SN | courtroom deputy's initials | 02 JUL 25 AM 7:45 U.S. DISTRICT COURT CLERK | date mailed notice |
| | | Date/time received in Central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RICHARD A. BUFF,                    )
                                    )
                  Plaintiff,        )
                                    )
         v.                         )    No. 00 C 7871
                                    )
TEMPEL STEEL COMPANY,               )
                                    )
                  Defendant.        )

MEMORANDUM OPINION AND ORDER

Richard A. Buff ("Buff") has charged his former employer Tempel Steel Co. ("Tempel") with employment discrimination actionable under the Age Discrimination in Employment Act ("ADEA," 29 U.S.C. §§621-34). Tempel has filed a Fed. R. Civ. P. ("Rule") 56 motion for summary judgment, and both sides have complied with this District Court's LR 56.1.[1] For the reasons set out in this memorandum opinion and order, Tempel's motion is granted and this action is dismissed.

Summary Judgment Standards

Familiar Rule 56 principles impose on Tempel the burden of

---

[1] LR 56.1 is designed to facilitate the resolution of Rule 56 motions by calling for evidentiary statements and responses to such statements (in each instance with record citations), thus highlighting the existence or nonexistence of factual disputes. This opinion cites to Tempel's LR 56.1(a)(3) statement as "T. St. ¶ --" and to Buff's LR 56.1(b)(3)(B) statement of additional facts as "B. St. ¶ --." Buff's Response to Tempel's LR 56.1(a)(3) statement is cited as B. Resp. ¶ --," although where a T. St. assertion is not contradicted a citation to the latter ordinarily suffices. This opinion employs the same "T." and "B." abbreviations in referring to the parties' exhibits and memoranda.

establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (St. Louis N. Joint Venture v. P & L Enters., Inc., 116 F.3d 262, 265 n.2 (7th Cir. 1997)). As Pipitone v. United States, 180 F.3d 859, 861 (7th Cir. 1999), has quoted from Roger v. Yellow Freight Sys. Inc., 21 F.3d 146, 149 (7th Cir. 1994):

> A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole.

As with any summary judgment motion, this Court accepts nonmovant Buff's version of any disputed facts, but only so long as it is supported by record evidence. But the real difficulty with Buff's submission is that he advances an entire set of snippets that are either not relevant or not probative, or both, on the gravamen of his claim--on the issue whether Tempel's conduct was the product of an impermissible bias attributable to Buff's age. What follows in the Background section, then, is culled from the parties' submissions in which Buff has really admitted the key elements of Tempel's submission (something that is graphically demonstrated by the heavy prevalence of "B. Resp. ¶ --" citations in the Background section.

2

## Background

Tempel manufactures steel laminations used in electric motors and transformers (B. Resp. ¶4). Buff was first hired as a jib bore operator at Tempel's Portage Tool Division ("Portage") in 1969, when he was 26 years old (T. St. ¶¶3, 5). Over the years Buff held several other positions, both at Portage and in Tempel's Motor Division plant (B. Resp. ¶¶5, 7). In December 1989 Tempel promoted 46-year-old Buff to Tool Engineering Manager at its Motor Division plant (B. Resp. ¶8).

Starting in 1992 Buff's supervisors began to counsel Buff that he needed to improve his managerial and communication skills (T. St. ¶9). Each of Buff's annual performance evaluations for the years 1991 through 1993 contained detailed comments about his need to listen and communicate more clearly and to spend more time ensuring that his supervised employees had the guidance they needed to excel in their positions (B. Resp. ¶¶9-12). In all three reviews, though, Buff's technical competence was rated "outstanding," and each year Buff discussed his review with his supervisor (T. St. ¶¶9-10, 13).

Despite those poor evaluations as to Buff's managerial abilities, Tempel promoted him to General Manager of Portage in August 1994 (B. Resp. ¶18). That decision was made because Tempel believed Buff's technical expertise would permit him to generate new business for Portage products (B. Resp. ¶17).

3

Tempel President and Chief Operating Officer George Valaoras ("Valaoras") and Tempel Chairman Vincent Buonanno ("Buonanno") approved of Buff's promotion (B. Resp. ¶18). As the Portage General Manager, Buff reported directly to Valaoras (B. Resp. ¶19).

Shortly after Buff's promotion Valaoras began to perceive that Buff's managerial shortcomings continued to affect his ability to manage his people effectively (B. Resp. ¶23). In his 1995 performance evaluation Valaoras rated Buff's communication and interpersonal skills as below standard (B. Resp. ¶25). Then in his 1996 evaluation Valaoras recommended that Buff receive additional counseling or training in those areas (B. Resp. ¶26). Buff attended at least five different courses in leadership and interpersonal skills-building, but Valaoras did not observe Buff's skills to be improving as a result, and he continued to have discussions with Buff about those problems (B. Resp. ¶¶26-27).

In 1999 Tempel Human Resources Manager Michael McMinn ("McMinn") began to visit the Portage facility on a regular basis to answer employees' questions about Tempel's personnel policies and employee benefits (B. Resp. ¶32). During those visits employees told McMinn that they were dissatisfied with Buff's

4

performance as Manager (T. St. ¶33).² By the end of 1999 almost every Portage employee had complained to McMinn about Buff's managerial incompetence (id.). McMinn reported to Valaoras that he perceived a serious problem with employee morale at Portage (B. Resp. ¶36). At Valaoras' request McMinn also discussed that problem with Buonanno (id.). By early 2000 Valaoras had concluded that Buff's managerial incompetence had created an employee relations crisis that threatened the long-term success of Tempel's operations at Portage (T. St. ¶37).

In early 2000 Valaoras recommended to Buonanno and Tempel's Executive Committee that Buff be removed from his position as General Manager of Portage (B. Resp. ¶38). That recommendation was adopted, but because Buff was a long-time Tempel employee with valuable engineering skills, Buonanno and the Executive Committee decided to retain Buff at the same salary and reassign him to a non-managerial position (id.). Valaoras recommended that Mark Bender ("Bender"), who had previously been the leader of Tempel's die design team, replace Buff as General Manager (B. Resp. ¶39). Buonanno and the Executive Committee adopted that

---

² Buff does not specifically admit or deny T. St. ¶33--he simply asserts "[t]his is all hearsay" (B. Resp. ¶33). That hearsay objection is groundless, for Tempel does not offer that statement to prove the matter asserted--instead the evidence is proffered to show that the statements were made to McMinn (see, e.g., Aetna Life Ins. Co. v. Wise, 194 F.3d 660, 666 (7th Cir. 1999)). Buff's attempts to deny T. St. ¶¶37 and 39 as hearsay fail for the same reason.

5

recommendation (id.).

On February 22, 2000 Valaoras and Buonanno met with Buff to tell him of his reassignment and Bender's promotion (B. Resp. ¶40). At the same time they offered Buff a position as Senior Design Engineer, with no loss of salary and the right to negotiate a contract concerning his new role with Tempel (id.). Buff had never before been offered an employment contract with Tempel, and Tempel did not ordinarily enter into such contracts with executives (B. Resp. ¶43).

At or shortly after that meeting, Tempel gave Buff a draft contract (B. Resp. ¶42). Among other things the contract (1) offered Buff the same annual salary that he had received as General Manager of Portage, (2) provided that Buff could perform his duties at any location of his choosing within 100 miles of Chicago and (3) specified that he was eligible for a bonus of up to 6% of his annual salary (B. Resp. ¶42). Under that contract Buff's employment would continue indefinitely, and he was entitled to severance pay if Tempel terminated him without cause (id.). Initially Tempel offered Buff 30 days of severance pay, but at Buff's request that was later increased to a full year's salary (B. Resp. ¶44). Nonetheless Buff felt that the reassignment was demeaning and humiliating because (1) his pay grade level was reduced from 18 to 13, (2) he was now required to report to former subordinate Bender and (3) he was reassigned

from a managerial position to an engineering position (B. Resp. ¶¶46-48).

From February 22 to March 23, 2000 Buff remained on Tempel's payroll, though he was not actually working, while he contemplated whether he would sign the contract (B. Resp. ¶45). Eventually he decided not to accept the contract, and his employment with Tempel ceased on March 23, 2000 (id.). On April 4, 2000 Buff began working for a competitor, National Lamination Company (B. Resp. ¶49).

At no time during Buff's employment with Tempel did Valaoras or Buonanno tell him that they felt he was too old for his job (B. Resp. ¶51). Buff believes he was the victim of age discrimination because Bender was younger than he and because Valaoras and Buonanno were concerned about losing Bender to a competitor because of Bender's unwillingness to wait until Buff retired to receive a promotion (T. St. ¶52). Buff points to a column Buonanno wrote for an October 1998 Tempel employee newsletter as direct evidence of discrimination (T. St. ¶53). He also asserts that beginning in 1993 many long-term Tempel employees were relieved of their positions or given less responsibility (B. Resp. ¶¶53, 60).

Buff filed a timely EEOC charge of age discrimination. After EEOC issued a right-to-sue letter, Buff initiated this action in December 2000, alleging that Tempel had demoted and

7

constructively discharged him in violation of ADEA.

## Age Discrimination

To prevail on his age discrimination claim, Buff must prove[3] that his age "actually played a role in [Tempel's decisionmaking] process and had a determinative influence on the outcome" (<u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 141 (2000), quoting <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 610 (1993)). Such discrimination can be established in one of two ways: with direct or circumstantial evidence that the adverse employment action would not have been taken but for his age (the so-called direct method), or "by successfully navigating the course of shifting burdens authorized in" the seminal <u>McDonnell Douglas</u> decision (<u>Mojica v. Gannett Co.</u>, 7 F.3d 552, 561 (7th Cir. 1993)(en banc)). Buff attempts both methods, but he succeeds at neither.

## Direct Evidence

Buff asserts that Buonanno's October 1998 column provides direct evidence of age discrimination. That claim is based on this statement by Buonanno (Buff Dep. Ex. 16 at RB 002):

---

[3] At this summary judgment stage, of course, Buff need not "establish" or "prove" or "show" anything. Instead he must merely demonstrate the existence of a genuine issue of material fact to defeat Tempel's summary judgment motion. Though this opinion will nonetheless frequently employ one of those quoted terms because that is the terminology used by the cited cases, this Court has consistently imposed that lesser burden on Buff in testing his claims.

> Tempel badly needs new blood, young blood, new ideas
> and people who don't always accept that yesterday's way
> was good enough. The youth have to show that they're
> worthy of the leadership baton by service and by
> knowledge. And the elders have to share the baton and
> pass the baton by the training, encouragement and
> inclusion of young people in the day-to-day business.

But as a matter of law, favorable comments about "young blood" are themselves insufficient to create a material issue of fact regarding age discrimination (Fortier v. Ameritech Mobile Communications, Inc., 161 F.3d 1106, 1113 (7th Cir. 1998)). And far from revealing any unlawful bias against older employees, Buonanno's remarks simply encouraged the training and mentoring of younger employees.

Indeed, Buff's emphasis on that language is extraordinarily misleading. To understand fully the context in which Bonanno included that exhortation--part of a "celebration of long-term service at Tempel" by a ceremony honoring employees with more than 25 years' service--it is really necessary to read the entire column. And so a photocopy of Buff Dep. Ex. 16 is attached as an appendix to this opinion. Buonanno's glowing tribute there to the more than 150 "25-year veterans" reflects the antithesis of an anti-age animus--as he said in part:

> [T]here are some common attributes of 25-year veterans
> [of Tempel]--persistence, loyalty, integrity, and know-
> how....The debt to these people is immense and it's
> often said, but worth repeating, that our Company's
> human resources are much greater than any machinery or
> physical assets. Collective human knowledge and
> commitment are unbeatable and irreplaceable.

9

Even with reasonable inferences taken in Buff's favor, then, Buonanno's remarks do not constitute direct evidence of age discrimination.[4]

Moreover, the concept of direct evidence of age discrimination requires a connection between the assertedly biased statements and the adverse employment decision--in this case the decision to reassign Buff (Gorence v. Eagle Food Ctrs., Inc., 242 F.3d 759, 766 (7th Cir. 2001)). There is no evidence of any such connection. Buff's claim that the column appears "close in time to the events that led" to his reassignment is baseless: Fully 16 months elapsed between the October 1998 publication of the column and buff's February 2000 reassignment. Buff's attempt to establish direct evidence of age discrimination thus fails for more than one reason.

Indirect Evidence

To prove discrimination via the McDonnell Douglas route, Buff must first establish a prima facie case of age discrimination by showing (1) that he was a member of the protected class (age 40 or over), (2) that he was performing his job to his employer's legitimate expectations, 3) that he was

---

[4] It is worth noting that Buonanno had joined in the decision to promote Buff to the important position of Portage General Manager in 1994, when Buff was 51 years old and was a "25-year veteran." It would certainly seem a strained inference to regard Buonanno as having acquired an age-based animus against Buff during the ensuing couple of years.

10

subjected to a materially adverse employment action and (4) that he was replaced by a substantially younger person (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 472 (7th Cir. 2002)). Buff fails on two levels: He has not proved either the second or the third of those elements.

As for the requirement of performance to Tempel's expectations, Buff points (1) to the fact that he continued to receive salary increases and bonuses in the years 1997 through 1999, (2) to the reference to his "strong individual performance" in the letter than announced his 1998 bonus and (3) to one instance in 1999 when he successfully resolved a dispute among employees (B. Mem. 11-12). But those items, as well as the other bits and pieces he seeks to scrabble together, fall far short of creating a material issue of fact in the face of the heavily supported and undisputed facts that (1) from the time Buff was first promoted to a managerial position his supervisors repeatedly noted his deficiencies in communications and human relations and (2) by the end of 1999 his supervisors believed that he had managed to alienate most if not all Portage employees, precipitating a serious morale crisis at that worksite. There is no doubt that Buff failed to perform his job to Tempel's expectations.

That alone would suffice to defeat his claim, but Buff has also failed to show that he was subjected to a materially adverse

11

employment action. Buff asserts that he was both demoted and constructively discharged, but he has demonstrated neither.

As to constructive discharge, Buff must show that he was "forced to resign because [his] working conditions, from the standpoint of the reasonable employee, had become unbearable" (Grube v. Lau Indus., Inc., 257 F.3d 723, 728 (7th Cir. 2001)). Just to state that requirement refutes Buff's contention: After all, Tempel offered him an alternate position with the same salary, allowed him to select his own work location and provided an employment contract that guaranteed Buff benefits to which he had never before been entitled.

Although Buff adverts to his lower pay grade, the decrease in his bonus eligibility and the promotion of a former subordinate to the position of his supervisor, that does not begin to approach an objectively intolerable work environment. In fact Buff's actual salary remained unchanged--and even the effect of his bonus eligibility decrease is unclear, because Buff admits that he and other Tempel employees regularly received bonuses exceeding their "maximum" eligibility. And while Buff was told he would report to Bender, he never tried to negotiate a different reporting arrangement with Tempel--something that could well have been met with a positive response, given Tempel's commendable flexibility about Buff's work location and its agreement to his request for a better severance pay guarantee.

12

In sum, Buff falls far short of proving constructive discharge.

Buff has also failed to show that his reassignment was a demotion. While his responsibilities were changed, his salary remained the same and he received additional benefits in the form of the increased worksite flexibility and job security that accompanied his employment contract. And so Buff's failure to show a constructive discharge is coupled with his failure to show an adverse employment action. And that means he has fallen short on not just one but two of the components of a prima facie case of age discrimination.

To further illustrate the poverty of Buff's case, even if he had survived the prima facie analysis (as he has not), he would still fall at the hurdle of establishing that Tempel's articulated reason for his reassignment--his deficiencies as manager that had created a severe morale crisis among the Portage employees--was a pretext for age discrimination. On that score Buff would have had to show either (1) that Tempel was more likely motivated by a discriminatory reason than by its proffered reasons or (2) that its proffered reasons are unworthy of credence (McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368, 372 (7th Cir. 1992)). And nothing in the evidence suggests either of those things.

As supposed evidence of pretext Buff identifies (1) a 1998 evaluation from Valaoras that states his communications skills

13

were "improving," (2) the fact that he did not receive written performance evaluations for "any year after 1995"[5] and (3) evidence that four other Tempel employees aged 52 and older were assertedly demoted (a characterization that Tempel disputes vigorously, and with what seems to be good reason[6]) during the years leading up to Buff's reassignment in 2000. But again nothing Buff has presented casts doubt on the proof that Buff's reassignment in 2000 was prompted by the morale crisis at Portage created by his lack of management skills. Hence Buff's total non-showing that Tempel's proffered reasons were pretextual provides an independent ground for his defeat.

## Conclusion

In candor, this is the kind of ADEA case that should never have been brought. Here an employer, faced with a serious deficiency in his managerial capacity on the part of a long-term employee who retained a high level of personal skills while exhibiting a serious lack of interpersonal skills,[7] really went out of its way to help a still-valued employee and to soften the blow of his transfer out of his unsuitable management position.

---

[5] That assertion is just plain wrong: Buff has acknowledged an evaluation for 1998, and Tempel has also provided a copy of Buff's 1999 evaluation (Valaoras Dep. Ex. 9).

[6] But given the present context, this opinion will go along with Buff's position for purposes of summary judgment analysis.

[7] That combination is scarcely extraordinary--some people are just not cut out to be managers.

14

If Buff had been capable of objectivity,[8] he would not have embroiled Tempel in his litigation.

Simply put, there is no way in which a reasonable inference of age discrimination may fairly be drawn here. In Rule 56 terms, Buff has not shown a genuine issue of material (that is, outcome-determinative) fact, and Tempel is entitled to a judgment as a matter of law. Its summary judgment motion is granted, and this action is dismissed with prejudice.

                                      */s/ Milton I. Shadur*
                                      Milton I. Shadur
                                      Senior United States District Judge

Date:  July 25, 2002

---

[8] Robert Burns taught a lesson too often missed by misguided employment discrimination plaintiffs:

> Oh wad some power the giftie gie us
> To see oursels as others see us!
> It wad frae monie a blunder free us,
>     An' foolish notion.

15

# Chairman's Viewpoint



Vincent J. Buonanno
Chairman
Tempel Steel Company

As this issue goes to press, plans are in the making for a celebration of long-term service at Tempel on November 15. Tempel men and women with more than 25 years with the Company will be recognized at a ceremony dedicated to their service. The number of people in this category is impressive, more than 150. If you consider that half of those people have well over 25 years bringing the average even higher, the total years of the November 15 group amounts to something over 4,000 years of collective experience. That's a powerful knowledge base working in our Company. It's impossible for us to include at this gathering a great number of people who have already retired with more than 25 years service as well, but that number is also impressive. Of course, the group of people who will be honored that evening cuts across a range of skills, job functions, departments, abilities and experience at Tempel and, of course, a variety of countries of origin, religions and birthplaces. But there are some common attributes of 25-year veterans – persistence, loyalty, integrity, and know-how which ranges from the most technical to the simpler but important amassing of knowledge of how to do our work in a way that gives value to our customers. The debt to these people is immense and it's often said, but worth repeating, that our Company's human resources are much greater than any machinery or physical assets. Collective human knowledge and commitment are unbeatable and irreplaceable.

But at the same moment that we acknowledge and celebrate long service, there is a very important matter to keep in mind. Tempel badly needs new blood, young blood, new ideas and people who don't always accept that yesterday's way was good enough. In fact, our founding was created by a 36-year-old fellow in 1945 named Tempel Smith who had run a press shop in a Chicago company that he didn't think was good enough or efficient enough, and so he left to start Tempel. There's a crying need at Tempel for youth to step up to the challenge here and take the baton. people, that is, often much younger than many of you are and I am. It's like a relay race where a runner who has finished his lap must round the track and hand the baton to the next runner. In industry, of course, the passing of the baton doesn't take seconds, but years. But for the baton to change hands, two things have to happen. The youth have to show that they're worthy of the leadership baton by service and by knowledge. And the elders have to share the baton and pass the baton by the training, encouragement and inclusion of young people in the day-to-day business. That's how it works in the slow motion relay race of an industrial company. When that baton passing doesn't happen in a company, something happens. Those runners standing waiting for the baton wait a while, watch the long-time runners go by for a lap or two extra and then sometimes the ones who are waiting leave and go to another race. Often the ones that leave are the fastest runners because they want to go somewhere where they can show how fast they can run right now.

So, at this moment when we're celebrating long-term service and we're busy with so many projects at all our plants and struggling to do better and keep our customers supplied, there are some good questions that we can all ask ourselves at every single level of the company, starting with me. If we've been here a long time, what are we doing to pass our knowledge and skills on to other people? What are we doing to prepare the next generation? What are we doing to encourage the

Buff DEP. EX. NO. 16
FOR I.D., AS OF 7-17-01

beginners and the people who have been here some years now and have proven their worthiness and are ready to step up to more responsibility? For those who are the younger ones, the question must be asked, what are we doing to prepare ourselves in education and training and in learning everything we can do to take the baton of service and leadership? I think the passing of the baton has two sides of responsibility. The responsibility of those who still have the baton and the ones who want to get their hands on it. In the long run, the best company in the lamination industry or any business that will have the longest term strength will not be the company which has the fastest sprinter, but the company which has the best relay race team that is constantly passing the batons of knowledge and leadership to others.

*Vim*



# Inside this Issue

Chairman's Viewpoint . . . . . . . . . .

President's Message . . . . . . . . . . . . . . .

AS400 Update . . . . . . . . . . . .

Slitter Installation . . . . . . . . . . . . . . . . .

Crowther Patent . . . . . . . . . . .

Libertyville Expansion . . . . . . . . . . . . .

40th Anniversary Party . . . . . . . . . . . .

In and Around Tempel . . . .

Community . . . . . . . . . . .

We'd Like You to Meet . . . . .

New Hires . . . . . . . . . . . .

Education/Training . . . . . .

Safety . . . . . . . . . . . . . . . . . . . . . . .

Retirements . . . . . . . . . . . . . . . . .

Tempel Tots and Births . . . . . . . . . .

Anniversaries . . . . . . . . . . . . . . . . . . .

*Cover Photo: The New Motor Division slitter -- see article inside page 8*

## TEMPEL news

*The Tempel News is a publication of the Tempel Steel Company for all of its employees and their families. Editorial offices are at:*

**Tempel Steel Company**
5215 Old Orchard Road, Skokie, Illinois 60077-1076.
Submit articles and photos for *Tempel News* to
The Editor c/o the Corporate Office.

*October, 1998*